**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

CHRISTOPHER M. SOTIR, AND JENNY
LEA RANDALL individually, and on behalf of
all others similarly situated,

Plaintiffs,

vs.

SEFCU and DOES 1-100,

Defendants.

---

**CLASS ACTION COMPLAINT**

Civil Case No.:  1:19-CV-0147 (GLS/CFH)

JURY TRIAL DEMANDED

Plaintiffs Christopher M. Sotir, and Jenny Lea Randall ("Plaintiffs"), by their attorneys, hereby brings this class and representative action against SEFCU and DOES 1 through 100 (collectively "SEFCU" or "Defendant").

## NATURE OF THE ACTION

1.      All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or her counsel.  Allegations pertaining to Plaintiffs or their counsel are based upon, *inter alia*, Plaintiffs' or their counsel's personal knowledge, as well as Plaintiffs' or their counsel's own investigation.  Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.      This is a class and representative action brought by Plaintiffs to assert claims in their own right, and in their capacities as the class representatives of all other persons similarly situated, as well as in their capacities as private attorneys general on behalf of the members of the general public.  SEFCU wrongfully charged Plaintiffs and the class members overdraft fees.

3.      This class action seeks monetary damages, restitution, and injunctive relief due to SEFCU's policy and practice of assessing a fee on transactions when there was enough money in the checking account to cover (pay for) the transactions presented for payment.  The charging of

such fees breaches SEFCU's contracts with its customers, who include Plaintiffs and the members of the class.  SEFCU also violated those contracts by charging its members fees on ACH, ATM, check, and debit card transactions who did not opt-into the overdraft program fees, when SEFCU clearly contractually promised that only members who opted-in would be charged those fees. Additionally, SEFCU violated General Business Law § 349 by charging fees against its members based on a misleading Opt-In Contract, in that SEFCU not only charged fees in a manner other than described by the Opt-In Contract which resulted in more fees being imposed by SEFCU on its members, but also because SEFCU provided no benefit whatsoever to those who did opt-in while nonetheless imposing on them an additional financial detriment above and beyond that imposed on those who did not opt-in. Finally, SEFCU also violated General Business Law § 349, as well as other laws, by transferring money from members' savings accounts into their checking accounts for the supposed purpose of avoiding a negative balance and a fees resulting from the negative balance, but despite this automatic transfer which would avoid the negative balance would nonetheless impose the fee on its members.

4.      The charging of these fees also violates federal law.  Because SEFCU failed to describe its actual overdraft service in its Opt-In Contract (because the language in its Opt-In Contract fails to describe the actual method by which SEFCU calculates its overdraft fees), and because, alternatively, SEFCU did not obtain opt-ins from its customers whatsoever, Regulation E (12 C.F.R. §§1005.17 *et seq.*) of the Electronic Fund Transfer Act (15 U.S.C.A. §§ 1693 *et seq.*) prohibited SEFCU from assessing overdraft fees for automated teller machine (ATM) and non-recurring debit card transactions (12 C.F.R. §1005.17(b)(1)(i)), but SEFCU did so anyway.

## PARTIES

5.      Plaintiff Christopher M. Sotir is a resident of Fort Johnson, New York, and was a member of SEFCU at all times relevant to the class action allegations.

6.      Plaintiff Jenny Lea Randall is a resident of East Aurora, New York, and was a member of SEFCU at all times relevant to the class action allegations.

7.      Based on information and belief, Defendant SEFCU is and has been a federally chartered credit union with its headquarters in Albany, New York, operating 46 branches in the upstate New York area.  SEFCU is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)).

8.      Without limitation, Defendants Does 1 through 100, include agents, partners, joint ventures, subsidiaries and/or affiliates of SEFCU and, upon information and belief, also own and/or operate SEFCU branch locations.   Each of Defendants Does 1 through 100 is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)).  As used herein, where appropriate, the term "SEFCU" is also inclusive of Defendants Does 1 through 100.

9.      Plaintiff is unaware of the true names of Defendants Does 1 through 100. Defendants Does 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against defendants Does 1 through 100 when the true names are ascertained, or as permitted by law or by the Court.

10.      There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named Defendants (including Does) such that any corporate individuality and separateness between the named Defendants has ceased, and that the named Defendants are *alter egos* in that the named Defendants effectively operate as a single enterprise, or are mere instrumentalities of one another.

11.      At all material times herein, each Defendant was the agent, servant, co-conspirator and/or employer of each of the remaining Defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining Defendants, and ratified and approved the acts of the other Defendants.  However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

12.      Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through

one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

13.     As to the conduct alleged herein, each act was authorized ratified or directed by Defendant's officers, directors, or managing agents.

<strong><u>JURISDICTION AND VENUE</u></strong>

14.     This Court has subject matter jurisdiction over this action pursuant to, *inter alia*, 28 U.S.C. § 1331.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a resident of this District, and pursuant to § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

<strong><u>FACTUAL ALLEGATIONS</u></strong>

**A.     SEFCU's Improper Charges of Fees**

16.     SEFCU is a credit union with 46 branches in the state of New York, holding approximately $3.6 billion in assets.  SEFCU offers its consumer banking customers a checking account.  One of the features of a SEFCU checking account is a debit card, which can be used for a variety of transactions including the purchasing of goods and services.  In addition to receiving a debit card, other features of a SEFCU checking account include: the ability to write checks; withdraw money from ATMs; schedule Automated Clearing House (ACH) transactions (certain recurring payments); and other types of transactions that debit from a checking account.

17.     In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), SEFCU assesses fees against customer accounts when it determines that a customer's account has been overdrawn.  On information and belief, financial industry standard nomenclature most often labels a paid item on a negative balance as an "overdraft fee," and an unpaid item on a negative balance as an "NSF fee."  On information and belief, the nomenclature used by SEFCU for labeling whether a fee it charges one of its members may be

4

inconsistent with this naming protocol as SEFCU may confuse using the label "NSF" rather than the label "overdraft" regardless of the true nature of the transaction.  For example, on information and belief, contrary to more common industry standard nomenclature, SEFCU might erroneously call a *paid* ACH or check transaction an "NSF" fee rather than an "overdraft" fee as other financial institutions would have called it.  Discovery will be necessary to more fully determine SEFCU's naming protocol on "NSF" and "overdraft" fees.

18.    Overdraft fees constitute the primary fee generators for banks and credit unions.  In 2009 alone, banks generated an estimated $37 billion from overdraft fees on debit purchases and ATM transactions.  While credit unions portray themselves to customers as more overdraft and fee friendly than banks, a 2015 study conducted by Moebs Services confirmed that the median overdraft fees charged by credit unions are not statistically significantly less than the median overdraft fees charged by banks.  For credit unions such as SEFCU, overdraft fees are a major source of revenue and a profit center.  According to a 2010 report by Georgetown University Law Professor Adam Levitin, overdraft fees comprise 6 to 7% of the gross revenue of credit unions. (Filene Research Institute Report, Overdraft Regulation A Silver Lining In The Clouds?  Filene Research Institute 2010).

19.    The high cost of an overdraft fee is usually unfairly punitive.  In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their account by mistake.  (May 2012 Pew Charitable Trust report entitled "Overdraft America:  Confusion and Concerns about Bank Practices", at p. 4).   More than 60% of the transactions that resulted in a large overdraft fee were for less than $50.  (June 2014 Pew Charitable Trust report entitled "Overdrawn", at p. 8). More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program (*id*. at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee (*id*. at p. 10).

20.    Unfortunately, the customers who are assessed these fees are the most vulnerable

customers. Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees. (*Id*. at p. 1). A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old. (*Id*. at p. 3). More than 50% of the customers assessed overdraft fees earned under $40,000 per year. (*Id*. at p. 4). Non-whites are 83% more likely to pay an overdraft fee than whites. (*Id*. at p. 3).

21.    As a result of banks and credit unions taking advantage of millions of customers through the unfair practice of charging overdraft fees through methodologies that maximize the possible number of expensive overdraft fees to be charged, there has been a substantial amount of litigation over the past few years. The outcome of these cases has predominantly fallen in favor of plaintiffs with the banks and credit unions repaying their customers over one billion dollars for the unlawfully assessed overdraft fees by way of jury verdicts and settlements.[1]

22.    The federal government has also stepped in to provide additional protections to customers with respect to abusive overdraft policies. In 2010, the Federal Reserve Board enacted regulations giving financial institutions the authority to charge overdraft fees on ATM and one-time debit card transactions only if the institution first obtained the affirmative consent of the customer to do so. (12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule")).

23.    To qualify as affirmative consent, the Opt-In Contract must include, but is not limited to the following:

- The customer must be provided the overdraft policy, including the dollar amount of any fees that will be charged for an overdraft and the daily maximum number of fees that may be charged (if there is no maximum, that fact must be stated);

- If the institution offers other means for avoiding overdrafts, such as linking the account to a different account or a line of credit, then it must state that

---

[1] http://files.consumerfinance.gov/f/documents/CFPB_Arbitration_Agreements_Notice_of_ Proposed_ Rulemaking.pdf , at p. 74-75.

those options exist.

- The opt-in consent must be obtained separately from other consents and acknowledgements;

- The consent cannot serve any purpose other than opting into the overdraft program;

- The consent cannot be a pre-selected checked box;

- The financial institution may not provide different terms for the account depending on whether the customer opted-in to the overdraft program.

If the financial institution does not obtain proper, affirmative consent from the customer that meets all of the requirements of Regulation E's Opt-In Rule, then it is not permitted to charge overdraft fees on ATM and one-time debit card transactions.

24.     The importance of Regulation E is further highlighted by the fact that the Bureau's study of actual practices found that: 1) ATM and debit card transactions are by far the most frequent transactions that occur; 2) overdraft fee policies entail expensive fees at very little risk to the financial institutions; and 3) opted-in accounts have seven times as many overdrafts that result in fees as not opted-in accounts.[2]

25.     At all relevant times, SEFCU has had an overdraft program in place for assessing overdraft fees which is: (1) contrary to the express terms of its contracts with members; (2) contrary to SEFCU's representations about its overdraft program to its members; and (3) contrary to its members' expectations regarding the assessment of overdraft fees.  Additionally, to the extent that SEFCU contends it does not derive its authority to impose fees on transactions involving a negative balance from the Opt-In Contract it uses, SEFCU had no lawful basis for charging such fees, and did not appropriately or adequately set forth in its contracts and other representations the basis for such fees so as to allow them to be charged.

26.     SEFCU entered into a contract with Plaintiffs and its other customers specifically

---

[2] http://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf

dictating the terms of its optional overdraft program ("Opt-In Contract"), which is attached hereto as Exhibit 1. SEFCU was required by Regulation E to provide an agreement to Plaintiffs and the class members which governs the terms under which SEFCU may assess Plaintiffs and the Class members overdraft fees for ATM and non-recurring debit card transactions, and provides them with the means to accept those terms. SEFCU's version of this agreement, unlike most agreements found at other financial institutions, also expressly states it covers overdraft fees for all types of debit transactions, not just for ATM and non-recurring debit card transactions. It specifically states it applies to "everyday debit card purchases, ATM withdrawals, and check and electronic funds transfers." With respect to all of these types of debit transactions, the Opt-In Contract promised that: "An overdraft occurs when you do not have sufficient funds in your account to cover a transaction, but we pay it anyway." This promise means that SEFCU is not authorized to assess an overdraft fee—because an overdraft has not occurred—unless there is not enough money in the customer's account to cover the transaction. The Opt-In Contract does not in any way state that SEFCU will deduct funds which have been placed on hold from the money in its members' accounts, and then use the resulting lesser subset of the account as the determinative figure for overdrafts. In fact, the Opt-In Contract says nothing about holds on funds in the account whatsoever, neither debit holds, *i.e.* holds on funds earmarked for pending transactions, nor deposit hold, *i.e.* holds on recently deposited funds. Yet it places both kinds of holds on funds in the account when determining whether to assess an overdraft fee for an ACH, check, ATM or debit card transaction. As discussed at greater length below, in addition to causing a breach of contract and other violations for all debit related transactions (checks, ACH, ATM, and debit card), because the Opt-In Contract does not describe SEFCU's actual overdraft service, SEFCU's Opt-In Contract additionally also fails to comply with Regulation E's requirement that customers must provide their affirmative consent to an accurate description of the overdraft program before being assessed an overdraft fee for an ATM or non-recurring debit card transaction. The Opt-In Contract nonetheless contains promises to which SEFCU is contractually bound.

27.     Aside from the fact that it does not contain an accurate description of SEFCU's overdraft program, the Opt-In Contract also violates Regulation E because, *inter alia*, (a) it is included, on a webpage, along with several other disclosures and acknowledgements, and has not been segregated from them, (b) it fails to state the daily maximum number of fees that may be charged, or that there is no limit to the number of fees that may be charged in one day, (c) it includes overdraft protection on the same form for ACH and checking and all debit card transactions rather than just for non-recurring debit card and ATM transactions, and (d) it includes, as a mechanism for acceptance, a box which is preselected "yes".

28.     SEFCU entered into a second contract with its customers governing the terms of their accounts, which is referred to herein as the "Account Agreement." The Account Agreement does not contain any term permitting SEFCU to charge an overdraft fee or NSF fee, and fails to define these terms, but instead states that SEFCU offers an overdraft program under which overdraft fees may be charged under certain circumstances *if* the member opts into the program. The Account Agreement states, "[t]he overdraft option is available to members who opt-in to the program," meaning that, for members who do not opt-in to the program, the credit union will have no right to charge an overdraft fee. Further, neither the Account Agreement nor any document related to the account states that the balance for purposes of assessing overdraft or NSF fees will be artificially lowered by Defendant to an amount which is less than in the account.

29.     SEFCU uses, on information and belief, three balances in its customers' accounts: "the "balance;" the "collected available balance;" and, the "artificial available balance." The "balance" (sometimes called actual balance or ledger balance) is the money in the account, without deductions for holds on pending transactions or on deposits. It is the official balance of the account. It is the balance provided to the customer in monthly statements, which is the official record of activity in the account. It is the balance used to determine interest on deposits and any minimum balance requirements. Further, based on information and belief, it is the balance which is used by SEFCU to report its deposits to regulators, shareholders and the public. It is the deposit

balance provided to regulators in call reports and reserve reports.  It is the balance used in financial reports to shareholders and the balance used for internal financial reporting.  It is the balance used by credit reporting agencies in providing credit ratings of SEFCU.

30.    The "collected available balance" is the "balance" less holds placed on certain deposits pursuant to the financial institution's "Funds Availability Policy" ("FAP").  Regulation CC (12 CFR part 229) establishes maximum permissible hold periods for checks and other deposits and all financial institutions are required by it to have a FAP.

31.    The "artificial available balance" as used by SEFCU is a completely different calculation than the "collected available balance." It takes the "collected available balance" and then further deducts from it pending debit card transactions which have not yet posted, meaning the money is still in the account of the credit union member.  SEFCU does this so that it may increase the overdraft and NSF fees it charges its members.  There is no requirement to use the "artificial available balance" and SEFCU had no authority or disclosure or statement in any of its contracts that it would use the "artificial available balance" for purposes of assessing overdraft or NSF fees.

32.    The "artificial available balance" created by SEFCU which it used is not the customer's actual money in the account.  Rather, it is the balance in a customer's account minus anticipated future debits (debits that may or may not occur) and minus deposit holds.  Not only is the practice of using this "artificial available balance" method rather than the money in the account to determine whether a transaction results in a negative and thus might be subject to an overdraft or NSF fee directly contrary to SEFCU's Account Agreement and Opt-In Contract, but such practices have resulted in SEFCU improperly charging unlawful overdraft and NSF fees.  SEFCU created this "artificial available balance" to increase overdraft and NSF fees it charged to its customers.

33.    SEFCU's practice of charging fees even when there is enough money in the account to cover a transaction presented for payment is inconsistent with SEFCU's contractual descriptions

as to when fees are assessed.  As a result, SEFCU has not only charged its customers, including Plaintiffs and the members of the Class, overdraft and NSF fees on ACH, ATM, debit card, and check transactions when not permitted by the contracts, but SEFCU additionally also has charged Plaintiffs and class members fees for ATM and/or non-recurring debit card purchases without obtaining their appropriate consent to do so, in violation of Regulation E.  By charging these fees, SEFCU also violated its contractual promises that it would not charge overdraft fees without obtaining its customers' separate consent.  SEFCU does not provide its customers with an accurate description of its overdraft or NSF fees program, and therefore cannot obtain their affirmative consent to enter the program.

34.     SEFCU has charged its members fees for paid items which were not on a negative balance in the account as required, and also when they did not opt-in to the overdraft program with no other authority or description to charge such fees or what they are.   Additionally, SEFCU created further fees when it would reject transactions and charge a fee as a result of holds placed on pending debit card or deposit transactions, despite their being enough money in the account to cover the transaction absent the hold.

35.     Plaintiffs Jenny Randall and Christopher M. Sotir allege that they did opt-in to the overdraft program.  However, to the extent that Defendant claims otherwise, Defendant had no legal or other basis under which to charge an overdraft or NSF fee under any circumstances, and certainly not when there was enough money in the account to cover the transaction at issue. All Plaintiffs plead in the alternative that such overdraft and NSF fees were wrongfully charged, inter alia, because, in addition to contradicting the Opt-In Contract,  neither the Account Agreement nor any related account document which can be considered a contract anywhere states holds would be placed on pending transactions to lower the real amount of money in the account to an artificially lower amount for purposes of assessing overdraft or NSF fees. Defendant charged Plaintiff Jenny Randall overdraft fees, labeled "Overdrawn," on January 18, 2018, and on May 10, 2018. Defendant charged Plaintiff Christopher M. Sotir an overdraft fee, labeled "Overdrawn," on

November 27, 2018. On information and belief, these fees would not have been charged if Plaintiffs Sotir and Randall had not opted-in to the Opt-In Contract.   As described, inter alia, in Paragraphs 42, 43, 44, and 45, *infra*., Plaintiffs would not have been charged these fees but for the fact they opted-in, and were provided no benefit or consideration in exchange.   On information and belief, there are instances when Defendant charged Plaintiffs improper overdraft and NSF fees[3] on ACH, ATM, checking or debit card transactions as a result of holds which Defendant placed on pending debit card transactions and deposits which would artificially lower the amount of money in Plaintiffs' accounts below what was actually in their accounts.

36.    SEFCU's contractual promises in the Opt-In Contract and Account Agreement to only assess fees when there is not enough money in the account to cover the item, and to only assess such fees against customers who had fully "opted-in" to the overdraft program, were also provided to customers in other disclosures and marketing materials.   However, directly contrary to these promises, SEFCU's policy and practice is to ignore whether there is money in the account or a negative balance.   Instead, SEFCU's policy and practice is, and at all times relevant herein has been, to assess overdraft fees (and what SEFCU may incorrectly call NSF fees) based on the artificial and hypothetical internal calculation "artificial available balance" rather than "balance." As explained, this method deducts holds on pending debit card transactions and deposits from the balance, rather than looking to the balance itself, or the actual money in the account, as the contracts state.

37.    SEFCU also violated the contracts by charging overdraft fees against its members who did not opt-in at all— meaning, *inter alia*, based on no description or explanation or terms of the supposed programs at all.

38.    Plaintiffs and the Class members have performed all conditions, covenants, and

---

[3] Again, as already alleged in Paragraph 17 of this First Amended Complaint, on information and belief it appears that SEFCU might be using industry non-standard nomenclature in labeling what is an NSF Fee versus what is an overdraft fee, and its only expressly stated term is of an overdraft fee in its Opt-In contract which states, "An overdraft occurs when you do not have sufficient funds in your account to cover a transaction, but we pay it anyway," and which further expressly states it pertains to ACH, check, debit card and ATM transactions.

promises required by each of them in accordance with the terms and conditions of the contracts.

39.    Meanwhile, Plaintiffs and the Class members could not have anticipated the harm resulting from Defendant's practice throughout the class periods.  As stated, the money in the account, without deduction for holds on pending transactions or on deposits, is the official balance of the account.  It is the balance provided to the customer in monthly statements, which is the official record of activity in the account.  It is the balance used to determine interest on deposits and any minimum balance requirements. Further, based on information and belief, it is the balance used by SEFCU to report its deposits to regulators, shareholders and the public.  It is the deposit balance provided to regulators in call reports and reserve reports.  It is the balance used in financial reports to shareholders and the balance used for internal financial reporting. It is the balance used by credit reporting agencies in providing credit ratings of SEFCU.  When SEFCU refers to balance or funds or money in the account, it is reasonable to interpret and understand that as referring to the official balance in the account—which is the balance without deduction for pending debit card transactions or deduction for holds on deposits.

40.    In its study, the Bureau concluded that when a financial institution creates the "overall impression" that it would determine overdraft transactions and fees based on the balance in the account rather than an artificially created balance from which pending transactions have been deducted, then the "disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive."  The Bureau further found that "consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures)." (Supervisory Highlights, Winter 2015, at p. 9.)

41.    In addition to the wrongful conduct and breaches outlined above, SEFCU violated its Opt-In Contract in another significant and harmful manner, causing damages to Plaintiffs and the Class members.  As explained, the CFPB enacted Regulation E, requiring an affirmative opt-in by customers of financial institutions, to try to reduce the tens of billions of dollars of overdraft

fees charged of consumers each year, or at least require their informed written consent of what they were getting themselves into before allowing such fees to be charged. What most commonly happens after a bank or credit union customer "opts-in" to the oxymoronically named "overdraft protection," is that debit card transactions which normally would have been declined due to an insufficient balance are instead now approved by the financial institution, with the financial institution essentially loaning its money to the member to cover the transaction. That is how a $3 Starbucks cup of coffee gets turned into a $28 Starbucks cup of coffee: if the credit union member had *not* opted-in to "overdraft protection" and did not have sufficient funds to cover the transaction, the transaction simply would be declined and the member would leave the Starbucks without his or her cup of coffee but with no overdraft or any other fee charged by the credit union for the transaction. However, if the member had opted-in to "overdraft protection" the credit union would approve the transaction and the member would leave the Starbucks with a cup of $28 coffee ($3 to Starbucks for the coffee and $25 to the credit union for an overdraft fee for it having advanced that $3 of its own money for that coffee). However, this Defendant did something very different.

42.    Specifically, for those members who have not opted-in to "overdraft protection" ***as well as for those members who have opted-in*** to "overdraft protection," on information and belief, on a Reg E transaction this Defendant declines the transaction if at the time of authorization the Defendant considers the balance to be negative, and authorizes the transaction only if at the time of authorization the Defendant considers the balance to be positive *even if the credit union member has opted-in to "overdraft protection."* In other words, Defendant treats both types of members, those who opted-in and those who did not opt-in, the same for purposes of declining the transaction if the balance is negative.

43.    The additional manner in which damages arise from this practice of SEFCU in this case for Reg E transactions is as follows. On information and belief, if Defendant authorized the transaction for both members because at the time of *authorization* Defendant considered the member's balance to be positive, if at the time of *posting* the Defendant considers the member's

balance negative, Defendant will *not* charge a fee of the member who did *not* opt-in, but *will* charge a fee of the member who *did* opt-in. In other words, both members will have their attempted purchase of the hypothetical cup of coffee declined if at the time of authorization the Defendant considers their balance to be negative, and both will have it approved if at the time of authorization the Defendant considers their balance to be positive, *but the member who opted-in will be assessed a $25 overdraft fee if at the time of posting his balance is considered negative, whereas the member who did not opt-in will not be*. In other words, the member who opted-in is worse off than the member who did not opt-in; the member who opted-in gets literally nothing in return for having opted-in except fees.

44.    Therefore, despite stating that for those who opted-in SEFCU would pay transactions when there were not sufficient funds in the account to cover them ("An overdraft occurs when you do not have sufficient funds in your account to cover a transaction, but we pay it anyway"), in addition to putting holds on transactions to create an "artificial available balance" rather than use the real balance as promised, SEFCU in reality did *not* pay transactions which resulted in a negative balance regardless of whether its members opted-in or not, but charged members who opted-in fees in identical situations in which members who did not opt-in were not charged fees, with no benefit in return. In other words, opting-in caused a financial detriment and presented no benefit whatsoever.

45.    Additionally, Defendant has a program by which it transfers money from its members' savings accounts into the members' checking accounts for the supposed purpose of avoiding a fee being imposed by Defendant if the checking account does not have enough money in it to cover the transaction. However, while Defendant does indeed transfer the money from the savings account to the checking account to do this, it nonetheless charges the fee anyway. For example, if a check for $9.00 and another check for $112 were to cause a negative balance of $121.00 in a member's checking account, there would be an automated transfer by the Defendant from this member's savings account of $121.00, intended to prevent any fees from being charged

for the negative balance resulting from these two checks, covering the entire $121.00 negative balance with this transfer from the savings account. However, despite Defendant causing this automatic transfer from the savings account to the checking account to avoid this negative balance and its associated fees, Defendant nonetheless would still charge class members two overdraft fees of $25 each, one for each of the two checks, *despite the balance not being negative as a result of the automatic transfer from the savings account*. And then, adding injury to insult, Defendant would initiate another automatic $50 transfer from the member's savings account, this time to pay itself for the two improper $25 fees it had just charged for each of those two checks which it had covered with the prior transfer from savings.

46.     As an example of this misconduct, on September 29, 2014, Plaintiff Jenny Randall entered into a transaction in the amount of $30, causing her account to be $-27.08. Through its overdraft transfer program, SEFCU automatically transferred $27.08 from Ms. Randall's savings account to her checking account on September 30, 2014. Nonetheless, Ms. Randall was charged a wrongful $25 overdraft fee on September 30, 2014, immediately after the transfer occurred.

47.     Therefore, Plaintiffs, on behalf of themselves and all others similarly situated, seek relief as set forth below.

48.     Plaintiffs were harmed by Defendant's policy and practice of charging overdraft fees when there was money in their accounts to cover the transaction. Plaintiffs entered into contracts with SEFCU wherein SEFCU contracted to charge overdraft fees for ACH, ATM, check, and debit card transactions only if Plaintiffs' accounts did not contain enough money to cover the transaction. By nonetheless charging Plaintiffs overdraft fees when their accounts did contain enough money to complete the transaction, SEFCU breached its contracts with Plaintiffs. It will be necessary to obtain Defendant's records to determine each instance of such a wrongful overdraft fee. However, to give two examples, on May 15, 2017, Plaintiff Jenny Randall had $625.53 in her account when she entered a transaction for $500, leaving her with a positive balance of $125.53. Despite the fact that her account contained sufficient funds to complete the transaction, Plaintiff

Jenny Randall was assessed a wrongful overdraft or NSF fee in the amount of $25.00.[4]  As a further example, on May 24, 2018, Plaintiff Christopher Sotir had $137.24_ in his account when he entered a transaction for $135.07, leaving him with a positive balance of $2.17.  Although his account contained sufficient funds to complete the transaction, Plaintiff Christopher Sotir was assessed a wrongful overdraft or NSF fee in the amount of $25.00.  Plaintiffs have a reasonable belief that a complete review of Plaintiffs' and SEFCU's records will show multiple instances in which SEFCU improperly charged class members and Plaintiffs overdraft fees for transactions despite the fact that Plaintiffs had enough money in their accounts to cover the transactions.

49.     Moreover, the assessment and unilateral taking of improper overdraft or NSF fees further reduces the balance and amount of funds in the account, resulting in and aggressively causing subsequent, otherwise non-overdraft transactions to be improperly treated as overdraft transactions, for which SEFCU charges more fees.  This practice was deemed to be deceptive and substantially harmful to customers by the Consumer Finance Protection Bureau, which made the following conclusions in its studies:

> Examiners also observed at one or more institutions the following sequence of events after the institutions switched balance-calculation methods: a financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above,

---

[4] Again, as already alleged in Paragraph 17 of this Complaint, on information and belief it appears that SEFCU might be using industry non-standard nomenclature in labeling what is an NSF Fee versus what is an overdraft fee, and its only expressly stated term is of an overdraft fee in its Opt-In contract which states, "An overdraft occurs when you do not have sufficient funds in your account to cover a transaction, but we pay it anyway," and which further expressly states it pertains to ACH, check, debit card and ATM transactions.

> examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

(*Infra,* Supervisory Highlights, Winter 2015, a pp. 8-9.)    A complete evaluation of SEFCU's records is necessary to determine the full extent of Plaintiffs' harm from this practice.

50.    Additionally, SEFCU violated Reg. E, *inter alia*, because the Opt-In Contract did not describe SEFCU's actual overdraft service—and as already alleged in Paragraph 28 also because it violated Regulation E by in several other respects—SEFCU violated Regulation E by charging overdraft fees on ATM and non-recurring debit card transactions.    SEFCU's Opt-In Contract, which failed to accurately describe the overdraft program, could not provide the means for affirmative consent; therefore, SEFCU was barred from charging those customers who allegedly agreed to the Opt-In Contract overdraft fees under any circumstances because required affirmative consent had not been obtained.

51.    Plaintiffs were harmed by this practice. A complete evaluation of SEFCU's records is necessary to determine the full extent of Plaintiffs' harm from this practice.

## CLASS ACTION ALLEGATIONS

52.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

53.    Plaintiffs bring this case, and each of their respective causes of action, as a class action pursuant to Federal Rule of Civil Procedure 23(a)(b)(1), (b)(2) and (b)(3) on behalf of the following class.

54.    The "Class" is composed of four classes:

**Class 1: The Positive Balance Class:**

> **All United States residents who have or have had accounts with SEFCU who incurred an overdraft/NSF fee or overdraft/NSF fees when the balance in the checking account was sufficient to cover the transaction or transactions at issue during the period beginning June 28, 2012 and ending on the date that this Class is certified.**

**Class 2: The Automatic Transfer From Savings Account to Checking Account Class:**

> All United States residents who have or have had accounts with SEFCU who incurred an overdraft/NSF fee or overdraft/NSF fees when money had been transferred from the savings account into the checking account to avoid the fee but were charged such fee anyway, during the period beginning June 28, 2012 and ending on the date that this Class is certified.

**Class 3: The Non-Opt-In Class:**

> All United States residents who have or have had accounts with SEFCU who did not Opt-In to SEFCU's Opt-In Contract but incurred an overdraft/NSF fee or overdraft/NSF fees for an ACH or ATM or check or debit card transaction(s) during the period beginning on June 28, 2012 and ending on the date that this Class is certified.

**Class 4: The Regulation E Class:**

> All United States residents who have or have had accounts with SEFCU who incurred an overdraft fee or overdraft fees for ATM or non-recurring debit card transaction(s) during the period beginning on August 15, 2010 and ending on the date that this Class is certified.

55.     Excluded from the Class is: (1) any entity in which Defendant has a controlling interest; (2) officers or directors of Defendant; (3) this Court and any of its employees assigned to work on the case; and (4) all employees of the law firms representing Plaintiffs and the Class members.

56.     This action has been brought and may be properly maintained on behalf of each member of the Class under Federal Rule of Civil Procedure 23.

57.     **Numerosity of the Class (Federal Rule of Civil Procedure 23(a)(1))** – The members of the Class are so numerous that a joinder of all members would be impracticable.  While the exact number of Class members is presently unknown to Plaintiffs, and can only be determined

through appropriate discovery, Plaintiffs believe that the Class is likely to include thousands of members based on the facts that SEFCU has approximately $3.6 billion in assets and operates 46 branches in New York.

58.     Upon information and belief, Defendant has databases, and/or other documentation, of its customers' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of SEFCU's customers have been harmed by its practices and thus qualify as Class members.  Further, the Class definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class members through notice published in newspapers or other publications.

59.     **Commonality (Federal Rule of Civil Procedure 23(a)(2)** – This action involves common questions of law and fact.  The questions of law and fact common to both Plaintiffs and the Class members include, but are not limited to, the following:

   a.     Whether, pursuant to the Opt-In Contract, Defendant promised to Plaintiffs and the Class members that it would not charge an overdraft fee if there was enough money in the account to cover the transaction;

   b.     Whether Defendant violated state consumer protection laws by entering into an agreement, the Opt-In Contract, with its customers, pursuant to which, despite all appearances, Defendant provided those customers with no benefit whatsoever, and instead charged them fees in situations in which customers who did not opt-in paid no fee.

   c.     Whether Defendant breached the Opt-In by assessing overdraft fees for transactions when customers' checking accounts contained enough money to cover the transactions;

   d.     Whether Defendant breached the Account Agreement or was

unjustly enriched or has money it received which it is not entitled to keep by charging overdraft fees of its members for ACH, ATM, check and debit card transactions who did not opt-in to the overdraft program;

    e.    Whether the language in the Opt-In Contract—"An overdraft occurs when you do not have sufficient funds in your account to cover a transaction, but we pay it anyway"—described Defendant's overdraft service pursuant to which Defendant assessed overdraft fees;

    f.    Whether Defendant breached its contract and/or violated consumer protection statutes or acted in breach of its covenant by charging customers who opted in to its overdraft program additional fees without providing any benefit;

    g.    Whether Defendant breached its contract and/or violated consumer protection statutes or acted in breach of its covenant of good faith by transferring money from its members' savings accounts to their checking accounts to avoid overdraft fees but charging such fees anyway;

    h.    Whether the Opt-In Contract violated Regulation E by (1) failing to be segregated from all other disclosures and acknowledgements, (2) failing to state the daily maximum number of fees that may be charged, or that there is no limit to the number of fees that may be charged in one day, (3) including ACH, check and all debit card transactions, and (4) including, as a mechanism for acceptance, a box which is preselected "yes".

    i.    Whether Defendant is liable under claims of breach of the covenant of good faith and fair dealing, unjust enrichment and money had and received;

    j.    Whether Defendant's conduct violated state consumer protection laws; and

    k.    Whether Defendant's conduct violated 12 C.F.R. § 1005.17.

60.    **Typicality (Federal Rule of Civil Procedure 23(a)(3))** – Plaintiffs' claims are

typical of all of the members of the Class. The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiffs and all of the Class members are substantially the same because all of the relevant agreements between Defendant and its customers, including the Opt-In Contract and the Account Agreement, were identical as to all relevant terms, and also because the challenged practices of charging customers for overdraft fees when there were sufficient funds in the accounts to pay for the transactions at issue are uniform for Plaintiffs and all Class members. Accordingly, in pursuing their own self-interests in litigating their claims, Plaintiffs will also serve the interests of the other Class members.

61.     **Adequacy (Federal Rule of Civil Procedure 23(a)(4))** – Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs have retained competent counsel experienced in class action litigation to ensure such protection. There are no material conflicts between the claims of the representative Plaintiffs and the members of the Class that would make class certification inappropriate. Plaintiffs and their counsel intend to prosecute this action vigorously.

62.     **Predominance and Superiority (Federal Rule of Civil Procedure 23(b)(3))** – The matter is properly maintained as a class action under Rule 23(b)(3) because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class members. Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter. Because the injuries suffered by the individual Class members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiffs and Class members to individually seek redress for Defendant's wrongful conduct. Even if any individual person or group(s) of Class members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions

by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, Plaintiffs and the Class members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

63.    Plaintiffs are not aware of any separate litigation instituted by any of the class members against Defendant.  Plaintiffs do not believe that any other Class members' interest in individually controlling a separate action is significant, in that Plaintiffs have demonstrated above that their claims are typical of the other Class members and that they will adequately represent the Class.  This particular forum is a desirable forum for this litigation because both Plaintiffs and Defendant reside in this District, where Defendant operates branch offices, and where its headquarters are located, and because the claims arose from activities which occurred in this District.  Plaintiffs do not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

64.    Plaintiffs anticipate the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class members.  Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices.  To the extent that any further notices may be required, Plaintiffs anticipate the use of additional media and/or mailings.

65.    This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, in that:

a.    Without class certification and determination of declaratory, injunctive,

statutory and other legal questions within the Class format, prosecution of separate actions by individual members of the Class will create the risk of:

1. Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

2. Adjudication with respect to individual members of the Class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

b. Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

1. The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

2. The extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

3. The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

4. The difficulties likely to be encountered in the management of a class action.

## FIRST CAUSE OF ACTION
### (Breach of the Opt-In Contract)

66.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

67.     Plaintiffs and each of the Class members except those identified in Class 3 entered into the Opt-In Contract with Defendant covering the subject of overdraft transactions on ACH, ATM, check, and debit card transactions.  This contract was drafted by and is binding upon Defendant.

68.     In the Opt-In Contract, Defendant promised that SEFCU would assess overdraft fees only when there was not enough money in the account to cover the transaction.   The contract specifically states it applies to ACH transactions, ATM transactions, check transactions, and debit card transactions.

69.     Plaintiffs and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Opt-In Contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

70.     Defendant breached the express terms of the Opt-In Contract by, *inter alia*, assessing overdraft fees on ACH, ATM, check, and debit card transactions when there was money in the account to cover the transaction or transactions at issue.

71.     As a proximate result of Defendant's breach of the contract, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## SECOND CAUSE OF ACTION
### (Breach of the Account Agreement)

72.     The preceding allegations are incorporated by reference and are re-alleged as if fully set forth herein.

73.     Plaintiffs and each of the Class members entered into the Account Agreement with

Defendant covering the subject of overdraft transactions. This contract was drafted by and is binding upon Defendant.

74.     In the Account Agreement, Defendant promised that it would not charge overdraft or NSF fees for ACH, ATM, check, or debit card transactions against its members who did not affirmatively opt-in to the overdraft program. Further, the Account Agreement it no way stated that a term of the contract was that for purposes of assessing an overdraft or NSF fee Defendant, rather than use the real balance, would instead use an artificially lower balance it created by placing holds on pending debit card transactions and deposits.

75.     Plaintiffs and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Agreement, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

76.     Defendant breached the express terms of the Account Agreement by, *inter alia*, charging overdraft fees and NSF against its members who did not opt-into the overdraft program, and charging such fees in violation of the terms of the agreements. While Plaintiffs contend that they did opt-in to the overdraft program, for the purpose of this cause of action, Plaintiffs allege in the alternative that should Defendant contend they did not opt-into the overdraft program that the charge of fees was either in breach of whatever documents provided authority to charge fees or alternatively was without authority to charge fees. Defendant charged each of them improper overdraft or NSF fees.

77.     As a proximate result of Defendant's breach of the contract, Plaintiffs and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## THIRD CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

78.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

79.     Plaintiffs and each of the Class members entered into at least one of two contracts with Defendant covering the subject of overdraft transactions, which have been identified herein as the Opt-In Contract and the Account Agreement. These contracts were drafted by and are binding upon Defendant.

80.     In the contracts, Defendant promised that SEFCU would assess overdraft fees for ACH and check and ATM and debit card transactions only when there was not enough money in the account to cover the transaction. Defendant also promised in the Account Agreement not to charge overdraft fees against members who did not affirmatively opt-into the overdraft program.

81.     Good faith is an element of every contract under New York law. Whether by common law or statute, all contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

82.     The material terms of the two contracts thus included the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiffs and each Class member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiffs' and the Class members' rights and benefits under the contract.

83.     Plaintiffs and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contracts, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

84.     Defendant breached the implied covenant of good faith and fair dealing by engaging in the overdraft or NSF practices and policies that have been alleged herein. Defendant

breached the covenant with regard to both contracts by charging its members overdraft or NSF fees when they had enough money in their accounts to pay for the ACH, ATM, check or debit card transaction in question. Defendant at all times had the ability to easily set its computerized algorithm to charge such fees on the "balance" rather than the "artificial available balance", but unilaterally chose to impose the "artificial available balance" so as to increase fees it charged its members. Further, Defendant breached the covenant with regard to the Account Agreement by charging overdraft fees against members who did not opt-into the overdraft program. Additionally, Defendant breached the covenant of good faith with regard to the Opt-In Contract by charging those members who accepted the terms of the Opt-In Contract fees in identical situations in which those who did not accept those terms were not charged insufficient funds fees, without providing the members who opted-in any benefit under the contract whatsoever. In other words, Defendant only provided detriment with no benefit to those members who opted-in. Further, Defendant breached the covenant by transferring money from members' savings accounts to their checking accounts to cover negative balances for the purpose of avoiding overdraft/NSF fees, but Defendant charged such fees despite the transfer of the money from the savings account to the checking account. These practices unfairly interfered with Plaintiffs and the Class members' rights to receive the benefits of the contracts, by forcing them to pay overdraft fees, and depleting their accounts thereby. In so doing, and in implementing its overdraft program for the purpose of increasing and maximizing overdraft fees, Defendant executed contractual obligations in bad faith, depriving Plaintiffs and the Class members of the full benefit of the contracts.

85.    As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiffs and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## FOURTH CAUSE OF ACTION
### (Unjust Enrichment/Restitution)

86.    The preceding allegations are incorporated by reference and re-alleged as if fully

set forth herein.

87.    As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft fees.  This is pled in the alternative to the breach of contract causes of action, *inter alia*, in particular should Defendant try to argue that any transactions are not covered by a contract.

88.    The Consumer Finance Protection Bureau has concluded that inadequate disclosure of the method for determining overdrafts and overdraft fees, which results in additional fees for customers, constitutes an Unfair, Deceptive, or Abusive Acts or Practices.  (CFPB Bulletin 2013-07[5], at p. 2 (defining Unfair, Deceptive, or Abusive Acts or Practices based on the FTC balancing test: "1) It causes or is likely to cause substantial injury to consumers; 2) The injury is not reasonably avoidable by consumers; and 3) The injury is not outweighed by countervailing benefits to consumers or to competition"); CFPB Supervisory Highlights, Winter 2015, at p. 9 ("Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.").)

89.    Because Plaintiffs and the Class members paid the erroneous overdraft or NSF fees assessed by Defendant, Plaintiffs and the Class members have conferred a benefit on Defendant, albeit undeservingly.  Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should it be allowed to retain such funds, Defendant would be unjustly enriched.  Therefore, Plaintiffs and the Class members seek relief as set forth in the Prayer below.

---

[5] http://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive-practices.pdf

## FIFTH CAUSE OF ACTION
### (Money Had and Received)

90.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

91.    Defendant has obtained money from Plaintiffs and the Class members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact. This is pled in the alternative to the breach of contract causes of action, *inter alia*, in particular should Defendant try to argue that any transactions are not covered by a contract.

92.    As a result, Defendant has in its possession money which, in equity, belongs to Plaintiffs and the Class members, and thus, this money should be refunded to Plaintiffs and the Class members. Therefore, Plaintiffs and the Class members seek relief as set forth in the Prayer below.

## SIXTH CAUSE OF ACTION
### (Violation of Electronic Fund Transfers Act (Regulation E)
### C.F.R. § 1005 et seq.  (authority derived from 15 U.S.C. § 1693 et seq.))

93.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

94.    By charging overdraft fees on ATM and nonrecurring transactions, SEFCU violated Regulation E (12 C.F.R. §§1005 *et seq*.), whose "primary objective" is "the protection of consumers" (§1005.1(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act (15 U.S.C. §§1693 *et seq*.), the "EFTA"] (§1005.1(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

95.    Specifically, the charges violated what is known as the "Opt-In Rule" of Reg E. (12 C.F.R. §1005.17.)  The Opt-In Rule states:  "a financial institution ... *shall not assess a fee or charge* ... pursuant to the institution's overdraft service, *unless* the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in contract]... *describing the institution's overdraft service*"  and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program (*Id*.)  The notice "shall be clear and readily understandable."

(12 C.F.R. §205.4(a)(1).)  To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description.  The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

96.    The intent and purpose of this opt-in contract is to "assist customers in understanding <u>how</u> overdraft services provided by their institutions <u>operate</u> .... by <u>explaining</u> the institution's overdraft service ... in a <u>clear and readily understandable way</u>"—as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Reg E.  *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z)).

97.    Aside from the fact that it does not contain an accurate description of SEFCU's overdraft program, the Opt-In Contract also violates Regulation E because, *inter alia*, (a) it is included, on a webpage, along with several other disclosures and acknowledgements, and has not been segregated from them, (b) it fails to state the daily maximum number of fees that may be charged, or that there is no limit to the number of fees that may be charged in one day, (c) it includes overdraft protection also for ACH transactions and check transactions and all debit card transactions in addition to non-recurring debit card and ATM transactions, and (d) it includes, as a mechanism for acceptance, a box which is preselected "yes".

98.    SEFCU failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution is permitted to assess overdraft fees against

customers' accounts through an overdraft program for ATM and non-recurring debit card transactions. SEFCU has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17, and in the other manners outlined in the above paragraph. SEFCU's Opt-In Contract fails to satisfy 12 C.F.R. § 1005.17 because, *inter alia*, it states that an overdraft occurs when there is not enough money in the account to cover a transaction but SEFCU pays it anyway, when in fact SEFCU assesses overdraft fees when there is enough money in the account to pay for the transaction at issue. Furthermore, Defendant failed to meet some or all of the other requirements of 12 C.F.R. § 1005.17 in obtaining opt-ins from its customers to enter the overdraft fee program, including failing to opt-in those customers whatsoever.

99.     As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions without obtaining affirmative consent to do so SEFCU has harmed Plaintiffs and the Class.

100.     Due to SEFCU's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiffs and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

## SEVENTH CAUSE OF ACTION
### (For Violation of New York General Business Law § 349)

101.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

102.     By the actions alleged above, Defendant has engaged in deceptive acts or practices against Plaintiff and the Class members in violation of New York General Business Law § 349.

103.     Defendant has engaged in at least three distinct practices which violate the GBL.

**A.     The First Deceptive Act or Practice:  Charging Overdraft Fees in Situations Where Defendant Stated It Would Not Do So.**

104.     The first deceptive practice in which Defendant engaged pertains to its Opt-In

Contract and Account Agreement. Defendant stated it would only charge overdraft fees against its customers on ACH, ATM, checking and debit card transactions when their accounts contained less money than was called for by a given transaction. It also stated it would not charge such fees at all unless a member affirmatively opted-in to the program. In reality, Defendant charged Plaintiffs and the Class Members overdraft fees when they had enough money in their accounts to pay for a given transaction, and also charged overdraft fees on ACH, and ATM, and debit card, and check transactions even when class members had not opted-in.

105.    The practices were deceptive because, *inter alia*, Defendant promised Plaintiffs and the Class members that it would only assess fees for overdrafts where the transaction at issue exceeded the actual amount of money in the customer's account, but instead charged fees when the account contained sufficient money to pay for the transaction in question. Defendant also engaged in a deceptive act or practice when it charged such fees despite its contractual and legal obligations not to do so without having obtained the affirmative consent of its customers based on an accurate description of its overdraft program. Defendant failed whatsoever to obtain many of its customers' consent. For those other customers who did agree to the terms of the Opt-In Contract, they did not provide affirmative consent to enter into the overdraft program because the Opt-In Contract did not accurately describe the overdraft program. That is because the Opt-In Contract indicated that an overdraft would only occur if there was not enough money in the account in its entirety to complete the transaction, while overdrafts were actually based on a subset of the account from which funds had been deducted due to recent deposits or pending transactions. This practice caused harm in that imposed fees on members when such fees should not have been imposed.

**B.    The Second Deceptive Act or Practice:  Contracting with Its Members to Enter an Overdraft Program Which Provided No Benefit**

106.    Second, Defendant entered into contracts with its customers through which those customers "opted-in" to an overdraft program for ACH, ATM, check, and debit card transactions

which, despite the deceptive terms of these contracts, actually provided no benefit to the customers. While the contracts purported to "opt" the members "into" an overdraft program which would presumably result in the payment of some overdraft transactions which were on a negative balance, Defendant in fact refused to pay any transactions that resulted in a negative balance whatsoever, whether the member had "opted-in" or not.  But Defendant charged those members who "opted-in" fees on debit card transaction where non-opted-in members were not charged such fees under identical circumstances.  This fact was also omitted from the contract.  As a result, these members were misled into entering a program which provided them no benefit, and caused them to incur additional fees.  Those who opted-in received literally no benefit while receiving detriment.

107.    This practice was materially deceptive.  By providing its customers a choice to "opt-in" to an overdraft program and by stating that Defendant would "pay it anyway" when there were not sufficient fees but then did not "pay it anyway," customers who "opted-in" were  subject to additional fees, with no actual benefit, and Defendant conducted a materially deceptive practice. No transactions on a negative balance were approved, either for members who opted-in or did not opt-in.  The only difference in treatment for the two classes of members was that those who did not opt-in were not charged fees under conditions where those who opted-in were charged such a fee.  Debit card transactions which resulted in a positive balance when they were entered, but caused a negative balance when they posted, resulted in fees for members who opted-in, but no fees for members who did not opt-in.

108.    By charging its members who opted-in to the program overdraft fees which it did not charge its members who did not opt-into the program, Defendant caused Plaintiffs and the Class Members significant injuries.  Defendant caused Plaintiffs and the Class Members additional injuries by charging them overdraft fees of any kind, when they would not have agreed to such fees had they known that there was no benefit under the contract.

**C.    The Third Deceptive Act or Practice:  Transferring Money From Savings to Checking To Avoid a Negative Balance But Still Charging An Overdraft Fee.**

109.    Defendant has a program by which it transfers money from its members' savings accounts into the members' checking accounts to help avoid a fee from occurring if the checking account does not have enough money in it to cover the transaction. However, while Defendant does indeed transfer the money from the savings account to the checking account to do this, it nonetheless charges the fee anyway. For example, if a check for $9.00 and another check for $112 were to cause a negative balance of $121.00 in a member's checking account, there would be an automated transfer by the Defendant from this member's savings account of $121.00, supposedly intended to prevent any fees being charged, covering the entire $121.00 negative balance with this transfer from the savings account. However, despite Defendant causing this automatic transfer from the savings account to the checking account to avoid this negative balance and its associated fees, Defendant nonetheless would still charge two overdraft fees of $25 each, one for each of the two checks, *despite the balance not being negative as a result of the automatic transfer from the savings account*.  And then, adding injury to insult, Defendant would initiate another automatic $50 transfer from the member's savings account, this time to pay itself for the two improper $25 fees it had just charged for each of those two checks which it had covered with the prior transfer from savings.

110.    This practice was materially deceptive. By operating a program for consideration of transferring money from the savings account into the checking account so as to avoid fees which would otherwise result from a negative balance, but then charging the fees despite having avoided the negative balance as a result of the transfer, Defendant cost class members substantial damages in the form of fees which should not have been charged.

111.    The three practices described in this cause of action were consumer-oriented. Defendant issued its Opt-In Contract and Account Agreement to all members of the public seeking to become members of Defendant.  Further, the contracts were made available to the public on Defendant's website.

112.    Plaintiffs suffered harm from these practices when they were assessed wrongful overdraft and NSF fees.

113.    Under § 349(h) Plaintiffs and the Class are entitled to damages and other relief in a form and amount to be determined by a court of law.

## EIGHTH CAUSE OF ACTION
### (Negligence)

114.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

115.    In the alternative, to the extent that all or any of above-described conduct was not intentional or contractual, it was negligent and below the standard of care and a dereliction of duties for the directors and officers of SEFCU to establish and implement, or allow to be established and implemented, an overdraft fee or NSF fee program which, *inter alia*, 1. deviated from the terms of its contracts with its members, and 2. which provided members no benefit, including to those members who entered into the Opt-In Contract, and 3. which transferred money from savings accounts into checking accounts to avoid fees but charged such fees anyway.

116.    As a result of such negligence, Plaintiffs and class members were substantially damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1.    For an order certifying this action as a class action;

2.    For compensatory damages on all applicable claims and in an amount to be proven at trial;

3.    For restitution on all applicable claims and in an amount to be proven at trial;

4.    For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

5.    For an order enjoining the wrongful conduct alleged herein;

6.    For costs;

7.      For pre-judgment and post-judgment interest as provided by law;

8.      For attorneys' fees under the account contracts, Electronic Fund Transfer Act, the common fund doctrine, and all other applicable law;

9.      For all relief available under New York General Business Law § 349; and,

10.     For such other relief as the Court deems just and proper.


**DEMAND FOR JURY TRIAL**

Plaintiff and the Class members demand a trial by jury on all issues so triable.


DATED:  February 5, 2019

CHERUNDOLO LAW FIRM, PLLC

BY:      *s/ J. Patrick Lannon*
         J. Patrick Lannon
         Bar Roll No. 516843
         AXA Tower I, 17th Floor
         100 Madison Street
         Syracuse, New York 13202
         Telephone (315) 449-9500
         Facsimile (315) 449-9804
         *plannon@cherundololawfirm.com*

**MCCUNE • WRIGHT • AREVALO LLP**
         Richard D. McCune, Pro Hac Vice
         rdm@mccunewright.com
         Emily J. Kirk, Pro Hac Vice
         ejk@mccunewright.com
         3281 E. Guasti Road, Suite 100
         Ontario, California 91761
         Telephone:  (909) 557-1250
         Facsimile:  (909) 557-1275

**THE KICK LAW FIRM, APC**
         Taras Kick, Pro Hac Vice
         Taras@kicklawfirm.com
         Robert Dart, California Bar No. 264060*
         Robert@kicklawfirm.com
         815 Moraga Drive

Los Angeles, California 90049
Telephone:   (310) 395-2988
Facsimile:    (310) 395-2088

Attorneys for Plaintiffs Christopher M. Sotir, and
Jenny Lea Randall, and the Putative Class

*Pro Hac Vice* Petition to be submitted